### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWIN FLORES,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-275 (JEB)** |
| **CROWN BUILDING MAINTENANCE, CO.,** *et al.***,** | |
| **Defendants.** | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Edwin Flores, a Hispanic man, was a construction worker at Crown Building Maintenance Company until his position was terminated in April 2023.  His tenure at Crown was troubled from the start, beginning with clashes with fellow construction worker Tommy Berrios over discriminatory comments the latter allegedly made about co-workers.  After filing a formal complaint about these comments to his employer's human-resources department, Flores believes that he became the target of a series of retaliatory acts, which started with a reduction in his overtime opportunities, worsened after he filed another complaint against Berrios, and reached a crescendo by the time of his termination.  He then brought this action against Crown and Berrios, alleging that both retaliated against him for filing these complaints, in violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act, and that Berrios aided and abetted these illegal acts.  He also alleged that both Defendants created a retaliatory hostile work environment in violation of the DCHRA.

Defendants now move for summary judgment, seeking to defend the various incidents Flores points to as employment decisions motivated by legitimate, non-retaliatory reasons.

Agreeing with Defendants as to all but one of these acts, and otherwise concluding that Flores has not made the requisite showing for a hostile work environment, the Court will grant the Motion for the most part.

## I.   Background

### A.  Factual Background

Because the Court is considering Defendants' Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff.  See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

Flores worked as a service technician at Crown from July 2021 to April 2023.  See ECF No. 24 (Pl. Stmt. of Material Facts), ¶¶ 5, 68.  He was initially hired in the "Tenant Services" division, where he was tasked with construction projects such as "drywall finishing."  ECF No. 21 (Def. Stmt. of Undisputed Material Facts), ¶¶ 3, 13.  As a member of a union, the terms and conditions of Flores's employment — including salary and overtime pay rate — were set by a collective-bargaining agreement.  Id., ¶ 12; ECF No. 21-2 (Exh. A) at 22–42 (CBA).  His immediate supervisor in the Tenant Services division was Patray Evans-Lynch, a Black woman. See Pl. SMF, ¶ 7; Def. SUMF, ¶ 14.

Plaintiff's woes began soon after he was hired.  Throughout September 2021, Defendant and fellow service technician Tommy Berrios allegedly made numerous racially insensitive comments about two Black co-workers while talking to Flores.  See ECF No. 24-1 (Exh. 5, First Ethics Compl.) at 89; ECF No. 24-1 (Exh. 2, Pl. Excerpt of Edwin Flores Dep.) at 78:4–19. Flores seems to have been the only one present when Berrios first made these comments, and he warned him that "this is a professional building and that is racist."  Pl. Ex. of Edwin Flores Dep. at 80:11–13, 81:4–5.  A recalcitrant Berrios brushed off Plaintiff's admonition and continued to

make these statements to Flores throughout the month, or so Flores says.  See Pl. SMF, ¶¶ 14–15.  While Plaintiff maintains that other Crown employees were present during some of these incidents, see id., none corroborated his story.  See Pl. Ex. of Edwin Flores Dep. at 99:13–100:2.  Berrios denied ever saying anything racist to anyone.  See ECF No. 21-3 (Def. Excerpt of Tommy Berrios Dep.) at 62:9–19.

This was not to be Flores's last run-in with Berrios, who in November 2021 became lead service technician and was thus in charge of "telling the other service technicians what the plan for the day was."  Def. SUMF, ¶¶ 15–17; see Pl. Ex. of Edwin Flores Dep. at 36:11–19.  According to Flores, Berrios wielded this authority in a manner that was "disrespectful and unprofessional" to him and continued to make discriminatory comments about Flores's Black co-workers.  See ECF No. 24-1 (Exh. 7, Dec. 22, 2021, Flores Email to HR) at 129; Pl. Ex. of Edwin Flores Dep. at 100:22–101:1–6.  For instance, Berrios purportedly "refuse[d] to have a formal conversation" with Flores "about working better together" and ignored his morning greetings.  See ECF No. 24-1 (Exh. 10, Dec. 28, 2021, Flores Email to Evans-Lynch) at 136.

Fed up with this course of conduct, Plaintiff filed an ethics complaint with Crown's Human Resources department alleging, among other things, that Berrios made "racist comments" even after Flores told him to "stop" telling these "jokes."  First Ethics Compl. at 90.  An HR investigator was appointed to look into the matter and, after interviewing all of the relevant Crown employees, found that Plaintiff's allegations were "unsubstantiated based on current information."  Pl. SMF, ¶¶ 28–34.

While that might have been it for the HR department's investigation, Flores's problems were far from over.  Soon after he raised his concerns to HR, he noticed "a complete decline in overtime opportunities": Flores went from averaging "approximately 8 hours of weekly []

overtime" to near zero.  Id., ¶¶ 37–38.  Although the amount of overtime work needed at any particular time was determined by Crown's client, see Def. SUMF, ¶¶ 6–9, Evans-Lynch and Berrios both seem to have had a role in assigning approved overtime jobs to service technicians like Plaintiff.  See Def. Ex. of Tommy Berrios Dep. at 35:11–13 (noting that Berrios "assign[ed]" service technicians "overtime tasks"); ECF No. 21-4 (Decl. of Patray Evans-Lynch), ¶¶ 7–10 ("I requested overtime hours from the [client]").  Plaintiff's overtime hours would never rebound, a fact he attributed to Berrios alone.  See Pl. SMF, ¶ 36; Pl. Ex. of Edwin Flores Dep. at 106:20–108:2.

Around this time, Plaintiff's supervisor Evans-Lynch also began receiving reports from Berrios accusing Flores of insubordination and delay in completing his assignments.  On one occasion, for instance, Berrios had to ask him three times to vacuum an office, to which Plaintiff responded that "Berrios should do it himself."  Def. SUMF, ¶ 19.  On another, Flores apparently declined to complete an order to "patch a room," which "resulted in . . .  Berrios having to rush to complete it."  Id., ¶ 22.  These and other "complaints of insubordination and work assignment[s] not completed in a timely manner" culminated in a June 2022 written warning.  See Exh. A at 44 (First Written Warning).

A few days after receiving this warning — which was ultimately removed from Flores's file, see Def. SUMF, ¶ 23 — Plaintiff filed another HR complaint against Berrios and Evans-Lynch, alleging that the warning was issued to retaliate against him for disclosing Berrios's discriminatory comments.  See ECF No. 24-1 (Exh. 15, Second Ethics Compl.) at 173–74.  He further submitted that, after issuing the first warning, Evans-Lynch laid out his menu of options going forward: "[M]ov[e] to the night shift, resign, transfer, or [be] terminated."  Id. at 176.  The HR investigator who handled Plaintiff's first complaint was brought back to conduct a new

4

investigation.  Id. at 176.  He found that Evans-Lynch had in fact put Flores to this choice, id. at 178, but found his allegation of retaliation "unsubstantiated" because the complaints on which the warning was based were "coming in from the client," and "[Flores] confirmed that he does not know how to do part of the job that he is required to do."  Id. at 179.

Matters continued to go south for Flores.  In August of that year, Evans-Lynch was informed that she had erroneously increased Plaintiff's salary beyond what the CBA called for. See Evans-Lynch Decl., ¶¶ 11–13; ECF No. 24-1 (Exh. 18, Aug. 29, 2022, Email About Overpayment) at 197–99.  Crown had thus overpaid Flores from May 1 until August 28, when this mistake was finally corrected.  See Def. SUMF, ¶¶ 44–46.  According to Crown, it explained to Flores that it had been paying him more than was his due and that it would be correcting his salary, but it generously allowed him to keep the surfeit.  Id., ¶¶ 46–47; Aug. 29, 2022, Overpayment Email at 198.  Flores nevertheless saw in this more evidence of a sinister plot to retaliate against him.  See Pl. SMF, ¶¶ 52, 55.

The following month, and given Plaintiff's alleged "failure to consistently perform the duties and expectations of his role," Crown placed him on a performance-improvement plan. See Def. SUMF, ¶ 24; Exh. A at 46–49 (PIP).  The plan noted, inter alia, that Flores lacked drywall-finishing expertise and had trouble sticking to "management hierarchy protocol."  PIP at 47.  Pursuant to the PIP, Flores was to attend weekly review sessions with Evans-Lynch, Berrios, and other management personnel until the end of September to ensure that he was "complet[ing] all tasks assigned" to him and "follow[ing] the chain of command."  Id. at 47–48. Plaintiff signed the plan and committed to obtaining proper training on drywall finishing — a promise that went unfulfilled, see Pl. Ex. of Edwin Flores Dep. at 56:5–7 — but noted that he did not "agree with" the statements therein.  See PIP at 48.

The PIP did not seem to work, as Flores received a second written warning just two months later.  See Def. SUMF, ¶ 29.  This time, the underlying concern with Plaintiff's work came not from Berrios or Evans-Lynch, but from the client itself.  See Pl. Ex. of Edwin Flores Dep. at 61:14-62:4; Exh. A at 58–59 (Second Written Warning).  Specifically, the client criticized a paint job Flores had completed at the work site.  See Second Written Warning at 58. He was accordingly instructed to undergo further training on tasks such as drywall finishing, which Flores seemingly never completed.  Id.

December came and brought with it more bad news for Plaintiff.  On December 8, 2022, he was told that he was being transferred to the appearance-care division, which handled aesthetic projects rather than construction projects, "to fit the operational needs" of the client. See Exh. A at 60 (Schedule Change Email).  This meant that Flores would now go from working the morning shift (4:00 a.m. to noon) to manning the night shift (6:00 p.m. to 2:00 a.m.).  Id.; see Pl. SMF, ¶ 60.  Crown explained that its client was significantly reducing the number of construction projects available, so "there was no need to have several service technicians" in the division Flores was previously assigned to.  See ECF No. 21-1 (Exh. 7, Decl. of Lavera Lansdown), ¶ 7.  Plaintiff asked his new supervisor, Yolanda Holmes-Williams, whether it was possible for him to keep the morning shift at the new division, see Exh. A at 62 (Dec. 19, 2022, Flores Email to Holmes-Williams), but she said that this was the only shift she could offer.  See Exh. A at 61 (Dec. 28, 2022, Holmes-Williams Email to Flores).

Rounding out this series of unfortunate events, Crown realized in early 2023 that the little client work that was coming its way "could be subcontracted to a third party."  Lansdown Decl., ¶ 8.  It accordingly decided to terminate all of its remaining service technicians, including Flores and Berrios.  Id.; see Def. SUMF, ¶ 40; Exh. A at 63 (Termination Letter).  Flores was

informed of this decision on April 27, 2023, and his termination became effective two weeks later.  See Termination Letter; Pl. SMF, ¶ 68.

      B.  Procedural Background

Seeing no need to wait until he was terminated, Flores filed this action in January 2023. See ECF No. 1 (Compl.).  The initial Complaint invoked this Court's diversity jurisdiction under 28 U.S.C. § 1332, but seemingly failed to notice that this did not apply, as Flores and Berrios are both domiciled in Maryland.  Id., ¶¶ 1–3.  The Court thus dismissed the case *sua sponte*.  See ECF No. 3 (Dismissal Order).  After that false start, Flores came back with a Motion to Vacate the Order dismissing the case and to Amend his Complaint to include a 42 U.S.C. § 1981 cause of action that would support federal-question jurisdiction and corresponding supplemental jurisdiction over the local claims.  See ECF No. 6 (Mot. to Vacate and Amend).  The Court granted this Motion, see Minute Order of Feb. 2, 2023, and also granted Flores's subsequent request to file a Second Amended Complaint.  See ECF No. 15 (Mot. to File SAC); Minute Order of May 24, 2023 (granting such Motion).  That operative Complaint alleges one count of hostile work environment under the D.C. Human Rights Act against both Defendants (Count I); one count of retaliation under the DCHRA against both (Count II); one count of aiding and abetting retaliation under the same Act against Berrios alone (Count III); and one count of retaliation under 42 U.S.C. § 1981 against both Defendants (Count IV).  See ECF No. 17 (Second Am. Compl.), ¶¶ 51–63.  Defendants now move for summary judgment.  See ECF Nos. 20, 21 (Defs. MSJ).

**II.      Legal Standard**

      Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247–48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Liberty Lobby</u>, 477 U.S. at 248; <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Holcomb</u>, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Liberty Lobby</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006); <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (<em>en banc</em>).  The Court must "eschew making credibility determinations or weighing the evidence."  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  <u>See</u> <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

III.    **Analysis**

In seeking summary judgment, Defendants first contend that the retaliation counts are infirm both because Flores has not suffered any adverse action and because, even if he has, there are legitimate explanations for each of them.   For these same reasons, they further argue that Berrios could not have aided or abetted these allegedly retaliatory actions.   The hostile-work-environment count is equally baseless, they continue, because Plaintiff falls far short of the demanding standard required to make out such a claim.   The Court proceeds in that order.

A.   Retaliation (Counts II and IV)

To prove retaliation, a plaintiff must establish: "[F]irst, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity."   Broderick v. Donaldson, 437 F.3d 1226, 1231–32 (D.C. Cir. 2006) (citation omitted).   An activity is "protected" for these purposes "if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment."   Beyene v. Hilton Hotels Corp., 815 F. Supp. 2d 235, 247 (D.D.C. 2011), aff'd, 573 F. App'x 1 (D.C. Cir. 2014) (citation omitted); see also Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008).   "The standard for retaliation under the DCHRA is identical" to that under Section 1981.   Harris v. Trustees of Univ. of D.C., 567 F. Supp. 3d 131, 144 (D.D.C. 2021).   The parties do not dispute that Flores engaged in protected activity when he filed ethics complaints with HR in December 2021 and July 2022.   See MSJ at 19.   To survive summary judgment on these claims, Plaintiff

must therefore produce sufficient evidence for a reasonable jury to conclude that he suffered adverse actions because of that activity.

Believing he has done so, Flores points to to five distinct actions: (1) the restriction of his overtime opportunities; (2) the warnings he received and the PIP he was placed on as a result; (3) his August 2022 pay reduction; (4) the schedule change from the day shift to the night shift; and (5) his termination.  See ECF No. 24 (Pl. Opp.) at 12.

The Court begins by determining which of these events qualifies as adverse within the meaning of the applicable standard.  It then considers whether Flores has provided any evidence that would allow a reasonable jury to find that the qualifying adverse actions were, in fact, retaliatory.

### 1.  *Adverse Actions*

A "materially adverse action" is one that, objectively speaking, would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Baloch, 550 F.3d at 1198, 1199 n.5 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  It "[t]ypically . . . involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  It conversely does not reach every "[m]inor . . . employment action[] that an irritable, chip-on-the-shoulder employee did not like."  Id. (quoting Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001)); see Ramos v. Garland, 77 F.4th 932, 938 (D.C. Cir. 2023) ("[T]he antiretaliation provision does not protect

an individual from 'all retaliation, but from retaliation that produces an injury or harm.'")

(quoting Burlington N., 548 U.S. at 67).

 While the retaliation standard historically "encompass[ed] a broader sweep of actions" than the discrimination standard did, see Baloch, 550 F.3d at 1198 n.4, the opposite is true after the D.C. Circuit's landmark decision in Chambers v. District of Columbia, 35 F.4th 870 (D.C. Cir. 2022) (*en banc*) (holding at 874–75 that for discrimination claims, adverse-action requirement obligates a plaintiff to show only that he was discriminated against with respect to his "terms, conditions, or privileges of employment" — not that he suffered an action carrying "objectively tangible harm"); Leach v. Yellen, 2023 WL 2496840, at *6 (D.D.C. Mar. 14, 2023) (describing post-Chambers differences in discrimination and retaliation adverse-action standards); see also Muldrow v. City of St. Louis, Mo., 2024 WL 1642826, at *7 (U.S. Apr. 17, 2024) (holding that, in claim of discriminatory transfer, plaintiff need not "demonstrate her transfer caused 'significant' harm").

 Start with the easier issues.  There is little doubt that three of the actions Plaintiff mentions — the reduction in overtime opportunities (and overtime pay), the salary reduction, and the termination — are materially adverse.  See Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (adverse action is one that would "affect the employee's position, grade level, salary, or promotion opportunities") (cleaned up); Holmes v. WMATA, 2024 WL 864217, at *9 (D.D.C. Feb. 29, 2024) (noting that "docking of pay" is "textbook example[]" of adverse action); Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 57 (D.D.C. 2022) (actions that cause

"financial harms" or "impacts related to an employee's . . . salary" qualify).  Defendants wisely offer no argument to the contrary.  See MSJ at 20–21.

On the flip side, it is just as clear that the warnings he received and the PIP Flores was placed on are not the kinds of actions that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N., 548 U.S. at 68.  As our Circuit has held time and again, "[F]ormal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions."  Stewart v. Evans, 275 F.3d 1126, 1136 (D.C. Cir. 2002);  Huang v. Wheeler, 215 F. Supp. 3d 100, 112 (D.D.C. 2016) (placement on PIP "does not meet the standard required for an actionable adverse action unless it results in a change in pay or grade"); but see Crowley v. Vilsack, 236 F. Supp. 3d 326, 331 (D.D.C. 2017) (concluding, without addressing Stewart, that "the imposition of a PIP — even one that does not result in a negative impact on salary, grade or performance appraisal — can constitute an adverse action").

Nowhere does Plaintiff attempt to show how any of these actions affected his grade or salary in any way: he does not argue, for instance, that they led to his eventual termination. Compare Holmes, 2024 WL 864217, at *9 (warnings could qualify if "later used to justify [employee's] suspension and demotion") with Pl. Opp. at 13 (asserting, without more, that "PIP could dissuade a reasonable employee from making a charge of discrimination") (emphasis added) (quoting Chowdhury v. Blair, 604 F. Supp. 2d 90, 97 (D.D.C. 2009)).  A reasonable jury thus would not be able to conclude that these actions were anything more than "insignificant slights."  Russell, 257 F.3d at 818.

That leaves the schedule change, which presents a closer question. Although this move also accompanied a division transfer, Flores's beef is with the change in hours, not assignment.

12

It is true, as Defendants note, that "employees generally may not mount . . . retaliation claims on mere dissatisfaction with less favorable work assignments, which includes unwanted work schedules." Achagzai v. Broad. Bd. of Governors, 2018 WL 4705799, at *7 (D.D.C. Sept. 30, 2018) (cleaned up).  Yet courts in this district have recognized that a schedule change may constitute adverse action in some circumstances.  See Bowyer v. Dist. of Columbia, 910 F. Supp. 2d 173, 192–93 (D.D.C. 2012) ("[S]chedule changes can qualify as materially adverse personnel actions when the context of the schedule change exacts an identifiable cost on the employee.").  One such circumstance is when a schedule change "prevent[s]" an employee "from spending important time with her child." Caudle v. Dist. of Columbia, 804 F. Supp. 2d 32, 44 (D.D.C. 2011), rev'd on other grounds, 707 F.3d 354 (D.C. Cir. 2013); cf. Burlington N., 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a . . . [parent] with school-age children.").

Here, Flores resisted the move to the night shift because he took care of his children in the evening, a task that was impossible to carry out after he was asked to work from 6:00 p.m. until 2:00 a.m. See Schedule Change Email; Pl. SMF, ¶¶ 60–63.  A jury could thus find that this action could have "exact[ed] an identifiable cost" on Plaintiff, even if it did not ultimately result in "fewer hours, lower pay, or different job responsibilities." Bowyer, 910 F. Supp. 2d at 193.  The Court will thus treat the change to the night shift as an actionable adverse action.

## 2. *Retaliatory Motive*

Flores still has a long way to go, however.  He must still raise a jury question of retaliation based on the adverse actions that remain: the reduction of overtime opportunities, the August 2022 pay reduction, the schedule change, and his termination.  The Supreme Court has established a three-part burden-shifting framework that governs claims of employment

retaliation.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. When he "meets this burden, '[t]he burden then must shift to the employer to articulate some legitimate, [non-retaliatory] reason' for its action.  If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful [retaliation]." Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (quoting McDonnell Douglas, 411 U.S. at 802, 804) (cleaned up).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-[retaliatory] reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).  The court's task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee . . . ?" Id.  The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted non-[retaliatory] reason for firing h[im] was not the actual reason, and that instead the [defendant] was intentionally [retaliating] . . . " Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016); see Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (foregoing analysis "appl[ies] equally to retaliation claims").

The Court takes each of the remaining adverse actions in order, considering only whether Defendants' proffered justifications for them are legitimate as a matter of law or could be considered by a jury as pretext for unlawful retaliation.

a.  Overtime Opportunities

Plaintiff first contends that the reduction of overtime opportunities was retaliatory.  This reduction began in January 2022, a few weeks after Flores filed his first internal complaint, and continued until he was fired.  See ECF No. 24-1 (Exh. 3, Flores Payroll Report) at 47–51. Defendants explain that they took this action for perfectly legitimate reasons — namely, that "Plaintiff did not possess sufficient knowledge in drywall finishing, . . . that it was critical that those assigned overtime completed the work efficiently and effectively to meet deadlines," and that overtime work was "granted only sparingly."  MSJ at 25.  Not so fast, retorts Plaintiff. Given that Defendants were aware of Plaintiff's protected activities, that Berrios said that he was in charge of "assign[ing]" other service technicians "overtime tasks," see Def. Ex. of Tommy Berrios Dep. at 35:11–13, and that this reduction began so soon after he filed his initial complaint, Flores contends that this cannot be the real reason for taking away overtime opportunities.  See Pl. Opp. at 16–17.

Flores has the better of this argument, if just barely.  During the six months preceding his first protected activity, Plaintiff received between eight and ten hours of overtime work per pay period.  See Flores Payroll Report at 46–47.  Yet he was no more skilled in drywall finishing at that point than at any other time during his employment with Crown, as he himself readily admits.  See Def. SUMF, ¶ 26; Pl. Ex. of Edwin Flores Dep. at 55:1–14.  Nor is there anything in the record suggesting that overtime opportunities were scarcer — or required different skills — after January 2022 or that the process for getting overtime tasks approved was any different.  Contra ECF No. 30 (Def. Reply) at 7.  And no one at Crown raised any concerns about Flores's ability to "perform overtime jobs in a timely and efficient manner" during the six months in which he was receiving these opportunities.  See id. at 7.  Since the conditions that

15

allegedly justified reducing the overtime available to Flores were "the very same" before and after he made his first complaint against Berrios, but were actually reduced only "after [he] engaged in protected activity, . . . [a] jury could reasonably infer pretext" here.  Geleta v. Gray, 645 F.3d 408, 414 (D.C. Cir. 2011).

As Plaintiff points out, moreover, there was close temporal proximity between his first complaint and the adverse action at issue here, and Defendants were well aware of the former.  See Pl. Opp. at 17.  Neither of these would win the day for Flores without more, of course.  See Tobey v. U.S. Gen. Servs. Admin., 480 F. Supp. 3d 155, 167 (D.D.C. 2020) (temporal proximity alone not enough); Brown v. Mills, 674 F. Supp. 2d 182, 197 n.8 (D.D.C. 2009) (employer knowledge of protected activity not enough).  When taken together with the rest of the record, however, they collectively amount to sufficient "circumstantial evidence to support an inference of retaliation." Tobey, 480 F. Supp. 3d at 167.

In their Reply, Defendants purport to defend their justifications for giving Flores less overtime work, but their hearts are plainly not in it.  They simply ask the Court to focus on the fact that their stated reasons "all constitute undisputed legitimate and non-retaliatory reasons," ignoring Plaintiff's responses and the record evidence to the contrary.  See Reply at 7.  True enough, these reasons are generally legitimate and would, if unanswered, support summary judgment in their favor.  See, e.g., Hussain v. Gutierrez, 593 F. Supp. 2d 1, 9 (D.D.C. 2008) (failing to "perform routine duties in a timely fashion" is legitimate reason for firing employee).  But when "the only explanations set forth in the record have been rebutted" — as is the case here — "the jury is permitted to search for others, and may in appropriate circumstances draw an inference of [retaliation]."  Aka, 156 F.3d at 1292.  Said another way, Flores has produced

enough evidence to permit a jury to reasonably conclude that Defendants' stated reasons for reducing his overtime were pretextual.

b.   Pay Reduction

Plaintiff argues that his pay reduction was also retaliatory, but here his luck begins to run out.  Defendants explain that this occurred because Flores had been overpaid from May 1, 2022, until August 28, 2022, after Evans-Lynch "erroneously put in an amount higher than what was set forth in the CBA."  Def. SUMF, ¶ 44; Evans-Lynch Decl., ¶¶ 11–13; Flores Payroll Report at 48–49 (showing overpayment).  She was informed of this error, and Crown's HR corrected it after speaking to Flores and informing him of this oversight.  See Overpayment Email at 198 ("I've spoken to [Flores] about this and [he] knows I would be letting you know."); ECF No. 21-5 (Decl. of David Martinez), ¶ 5.  Although he received more than he was owed, he was even allowed to keep the extra salary.  See Martinez Decl., ¶ 6.

Plaintiff does not dispute that he was, in fact, paid more than he was owed.  See Pl. Opp. at 19.  Nor could he.  See CBA at 40 (showing that correct hourly rate was $39.53, not $42.17 Flores was paid during time period).  He instead argues that Defendants' explanation is pretextual for two reasons.  First, Evans-Lynch was "the only person involved in the pay reduction" and she was also responsible for the written warnings.  See Pl. Opp. at 19.  Second, this pecuniary oversight was "never communicated to Flores."  Id.

To begin, ceasing to overpay a unionized employee does not evince retaliation; it merely shows an effort to correct an error.  In any event, Flores's contentions are simply not true.  As his own exhibits show, Evans-Lynch was not "the only person involved in the pay reduction."  On the contrary, she was informed by Crown's financial manager that Flores was being overpaid, see Evans-Lynch Decl., ¶ 12 — showing that Evans-Lynch certainly believed this to

be the case, see Holmes, 2024 WL 864217, at *18 (overpayment not pretextual if employer "honestly believed that there had been" one) — and she then had to work with the HR department to correct this.  See Overpayment Email at 201–08.  An HR employee then notified Plaintiff's union that this change was going into effect.  Id. at 197–98.  Notably, nothing in the record suggests that these other employees even knew of Flores's protected activities.  In that same email, moreover, the HR employee indicated that he had "spoken to" Flores about his salary change before it went into effect.  Id.; see also Martinez Decl., ¶ 5 (HR employee "promptly . . . notified both Mr. Flores" and the union).  Putting forth no other reason to doubt Defendant's explanation, Plaintiff has fallen far short of showing pretext here.

c.  Schedule Change

Flores's submission that his schedule change was animated by retaliatory animus fares no better.  This took place, Defendants say, primarily because of Crown's client's decision to "cease using Crown's construction service."  Def. SUMF, ¶ 30; Lansdown Decl., ¶¶ 4–6.  With no new construction projects to assign to service technicians, and considering Flores's "limited skills and knowledge regarding drywall finishing and other construction related tasks," Crown decided to transfer Plaintiff and two other service technicians to the night shift at its non-construction division.  See Def. SUMF, ¶ 33; Pl. Ex. of Edwin Flores Dep. at 66:21–67:1; Schedule Change Email.  Defendants have accordingly offered not one but two legitimate and interlocking reasons for Flores's schedule change.

In seeking to rebut these justifications, Flores posits that he has put forth evidence of "temporal proximity" between his protected activities and his schedule change.  See Pl. Opp. at 18.  He misses the proximity mark by a few months, however.  His move to the night shift did not take place until December 2022, roughly a year after he filed his first complaint and five

18

months after he filed his second.  See Pl. SMF, ¶¶ 28, 46, 60.  Although "neither the Supreme

Court nor [the D.C. Circuit] has established a bright-line three-month rule," Hamilton v.

Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), this Circuit has generally found that such

gaps negate the temporal proximity needed to help a plaintiff survive summary judgment.  See,

e.g., Taylor, 571 F.3d at 1322 (rejecting interval of two-and-a-half months as establishing

temporal proximity and citing, with approval, cases that did not find temporal proximity when

two to three months elapsed between protected activity and adverse action).  So much for

temporal proximity.

Plaintiff's faith in his evidence of "dishonest explanations" is equally misplaced.  See Pl.

Opp. at 18.  He first points to the fact that one of the other service technicians who were

purportedly moved to the night shift along with him, Attrelle Thomas, has filed an action

against Defendants alleging a "pattern of retaliation from the same supervisors [that] is eerily

like that of Flores."  Pl. Opp. at 20.  The first hurdle for Flores is that these allegations are,

without additional record support, just that — allegations in a complaint (and not even in

Plaintiff's own).  See Kirkland v. McAleenan, 2019 WL 7067046, at *22 (D.D.C. Dec. 23,

2019) (allegations in complaint must be supported by evidence to preclude summary judgment).

There is an even more basic error, however — namely, that Plaintiff's own deposition testimony

indicates that Thomas was not one of the service technicians moved to the night shift.  See Pl.

Ex. of Edwin Flores Dep. at 66:21–67:1 ("These changes of schedule was given only to me, to

Harry Byers[,] and Renee Hernandez.").

His first assault thwarted, Flores falls back on the fact that he "had seniority over the

newer employees that replaced their day shifts."  Pl. Opp. at 20.  Since seniority was an

important factor in assigning such schedules, he continues, this proves that "employees that had

seniority should have been provided more favorable schedules" and that Defendants' explanation is mere cover for a retaliatory motive.  Id.  Yet there is no evidence that seniority actually was a consideration in making these kind of decisions.  Flores's own testimony mentions that the other two service technicians who were moved to the night shift also had seniority over some of the service technicians who kept the day shift.  See Pl. Ex. of Edwin Flores Dep. at 68:6–14.  As a result, there is no evidence of pretext here, since he was not the only service technician with seniority to receive a schedule change.  In such absence, he cannot survive summary judgment.

> d.  Termination

This brings us to the last adverse action that Flores challenges as retaliatory: his termination in early 2023.  Defendants offer one of the "two most common legitimate reasons for termination[,] . . . the elimination of the plaintiff's position altogether."  Harris v. Dist. of Columbia Water & Sewer Auth., 791 F.3d 65, 69 (D.C. Cir. 2015) (cleaned up).  As a result of its client's decision to stop using its construction services, Crown eliminated the position of service technician and terminated the six remaining employees with that title, including Flores and Berrios.  See Def. SUMF, ¶ 39; Lansdown Decl., ¶¶ 8–9.

In response, Flores says . . . nothing at all.  Since he has not addressed Defendants' legitimate reasons for terminating him, he has conceded the issue.  See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

*    *    *

In sum: Flores goes 1 for 5 on his retaliation counts.  His written warnings and placement on a PIP were not sufficiently adverse to support a claim of retaliation.  While he has produced enough evidence to permit a reasonable jury to infer retaliation from the denial of overtime opportunities, he has not done the same for any of the other adverse actions — the docking of his pay, his schedule change, and his termination.  The Court will accordingly grant Defendants' Motion for the most part, but will deny it as to the reduction in overtime work.

    B.  <u>Aiding and Abetting (Count III)</u>

Next up is the DCHRA aiding-and-abetting count, which Flores brought against Berrios alone and which the Court can deal with summarily.  For starters, "an individual cannot be held liable for aiding and abetting discriminatory or retaliatory conduct where the [employer] itself did not engage in discriminatory or retaliatory conduct."  <u>Ranowsky v. Nat'l R.R. Passenger Corp.</u>, 244 F. Supp. 3d 138, 147 (D.D.C. 2017); <u>see also</u> <u>Gaujacq v. EDF, Inc.</u>, 601 F.3d 565, 576 (D.C. Cir. 2010) ("[B]ecause [employer] did not discriminate against [plaintiff], it is clear that [supervisor] did not aid and abet any unlawful discrimination.") (citing <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983)).  As Defendants are entitled to summary judgment on four of the five adverse actions alleged, it follows that Berrios is likewise entitled to summary judgment on the same actions because there was no retaliatory act to aid or abet.

This leaves the reduction of overtime opportunities.  To establish aiding-and-abetting liability, Flores must point to evidence that Berrios "assist[ed] <u>another</u> person in" retaliating against him.  <u>McCaskill v. Gallaudet Univ.</u>, 36 F. Supp. 3d 145, 156 (D.D.C. 2014) (emphasis added).  The problem for Plaintiff is that, as far as the Court can tell, Berrios was the principal actor in reducing his overtime opportunities.  <u>See</u> Pl. Opp. at 22 (charging Berrios alone with "severely hamper[ing] Flores['s] opportunities for overtime"); SAC, ¶ 58 (alleging that Berrios

alone "stopped or prevented Flores from obtaining anymore overtime after his complaint of discrimination"). What is more, the acts that Berrios took to aid and abet this adverse action are the very same acts that he committed in violation of Section 1981 and the DCHRA. Compare Pl. Opp. at 17 (arguing that Berrios retaliated against Plaintiff by "restricting Flores['s] overtime opportunities"), with id. at 22 (contending that Berrios aided and abetted by "hamper[ing] Flores['s] opportunities for overtime"). Because individuals "cannot aid and abet their own allegedly [retaliatory acts]," Berrios is consequently entitled to summary judgment as to this claim, too. Gatling v. Jubilee Housing, Inc., 2022 WL 227070, at *6 (D.D.C. Jan. 26, 2022).

      C. Hostile Work Environment (Count I)

      With the finish line in sight, the Court turns to Count I, which alleges that the foregoing adverse actions by Defendants created a retaliatory hostile work environment. "The bar for demonstrating a hostile work environment is a high one: A plaintiff must show that his employer subjected him to [retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164, 183 (D.D.C. 2016) (cleaned up); see also Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013). In evaluating a hostile-environment claim, a court "looks to the totality of the circumstances, including the frequency of the [retaliatory] conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)). By adhering to these standards, the court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary

tribulations of the workplace." Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted).  While a plaintiff need not prove a hostile work environment at this stage, he still must produce facts sufficient to allow a jury to find "extreme" conduct that satisfies the "demanding" standard for such a claim.  Id.

Flores does not come close to satisfying this standard.  At most, he points to the foregoing adverse actions, which are merely "work-related actions by supervisors" that "courts typically do not find . . . to be sufficient for a hostile work environment claim."  Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (citation omitted); Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 79 (D.D.C. 2005) ("[M]ere reference to alleged disparate acts of discrimination against plaintiff cannot be transformed, without more, into a hostile work environment.").  These actions do not rise to the level of conduct that is "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  Harris, 510 U.S. at 21 (citation omitted); see, e.g., Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing claim where allegations of "disparaging remarks, criticisms of [plaintiff's] work, and other negative comments d[id] not sufficiently demonstrate a significant level of offensiveness"); id. ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context.") (citations omitted); see also Lester v. Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim.").

Only one of these adverse actions, moreover, has a sufficient causal connection to Flores's protected activity.  See Bergbauer v. Mabus, 934 F. Supp. 2d 55, 83 (D.D.C. 2013)

("Logically, only the actions that have a causal link to protected activity may be considered part of a [retaliatory] hostile work environment claim."); <u>Noviello v. City of Boston</u>, 398 F.3d 76, 93 (1st Cir. 2005) ("It is only those actions, directed at complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus.").  As explained above, the only act that was plausibly taken to retaliate against Flores was the reduction in overtime opportunities.  <u>See</u> *supra* Section III.A.  What he has shown, therefore, is not so much a hostile work environment as much as a series of separate employment incidents, only one of which could be said to have been motivated by retaliatory animus.  <u>Cf.</u> <u>Nurriddin</u>, 674 F. Supp. 2d at 94 (series of adverse actions that "indicates less a pervasive pattern of harassment, and more just isolated employment incidents occurring over a long period of time" not enough to establish hostile work environment).  The Court will thus grant Defendants' Motion with respect to this count as well.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion as to everything except Plaintiff's overtime claim in Counts II and IV.  A separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  <u>April 25, 2024</u>